UNITED STATES DISTRICT COURT      ELECTRONIC PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
GLENN WILLIAMS,

                       *Plaintiff*,

                MEMORANDUM
         - against -             AND ORDER

2000 HOMES INC.; AMNON KOZHINOFF; 2D      09-CV-16 (JG) (JMA)
PROPERTIES, LLC; DEAN MAVRIDES;
MORTGAGE ENTERPRISE, LTD.; MARK
SANDERS; JOSEPH DEGAETANO;
GE MONEY BANK; MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.; WMC
MORTGAGE CORP.; BANK OF AMERICA, N.A.;
LITTON LOAN SERVICING LP; ANSON STREET
LLC; and RESURGENT CAPITAL, L.P.,

                       *Defendants*.
----------------------------------------------------------------- X

A P P E A R A N C E S:

        DAVID J. HERNANDEZ & ASSOCIATES
             26 Court St. Suite 2200
             Brooklyn, NY 11242
     *By:*      David J. Hernandez
             Richard Gottesman
             *Attorneys for Plaintiff*

        DORSEY & WHITNEY LLP
             250 Park Ave.
             New York, NY 10177
     *By:*      David A. Scheffel
             *Attorneys for Defendants GE Money*
             *Bank & WMC Mortgage LLC*

        HISCOCK & BARCLAY LLP
             1100 M&T Center
             3 Fountain Plaza
             Buffalo, NY 14203
     *By:*      Jessica Baker
             Charles C. Martorana
             *Attorneys for Defendant Mortgage*
             *Electronic Registration Systems, Inc.*

GREENBERG TRAURIG, LLP
  200 Park Avenue P.O. Box 677
  Florham Park, NJ 07932
By: Cory Mitchell Gray
  Theodore McEvoy
  *Attorneys for Defendants Litton Loan*
  *Servicing LP and Bank of America, N.A.*

JOHN GLEESON, United States District Judge:

Plaintiff Glenn Williams sued numerous defendants in New York State Court, alleging various causes of action arising from his 2007 purchase of a home on 179th Street in Queens, New York ("the 179th St. property," or "the property"). On February 5, 2009, the defendants filed a notice of removal, and Williams subsequently moved to remand to state court. On February 27, 2009, I denied this motion and directed Williams to file an amended complaint amplifying his federal law claims, which were suggested during oral argument but not readily apparent from the face of the complaint. On May 27, 2009, motions to dismiss the amended complaint were filed by defendants GE Money Bank ("GEMB"), WMC Mortgage, LLC ("WMC"), Mortgage Electronic Registration Systems, Inc. ("MERS"), Litton Loan Servicing LP ("Litton"), and Bank of America, NA ("BOA") (collectively, the "moving defendants" or "defendants"). In his opposition, Williams sought leave to file a second amended complaint. At a June 30, 2009 status conference, I told the parties that I would resolve the pending motions to dismiss before deciding whether Williams should be granted leave to amend his complaint. I heard oral argument on the motions on July 24, 2009. For the foregoing reasons, I dismiss the amended complaint against the moving defendants.

BACKGROUND

According to the factual allegations in the complaint, which I assume to be true in adjudicating these motions, Glenn Williams is a "minority homeowner," Amended Compl. ¶ 1

("AC"), and a "first time home buyer with no experience in real estate or financing matters." *Id.* at ¶ 9. In 2006, Williams saw a newspaper ad placed by defendant 2000 Homes Inc. ("2000 Homes") offering reasonably priced new homes. He called the number advertised and scheduled an appointment with a real estate agent.

While waiting in the reception area of 2000 Homes, Williams perused two large photo albums purportedly containing photographs of happy 2000 Homes customers. All of the people in the photographs were "Black Americans." *Id.* at ¶ 27. Williams met with defendant Amnon Kozhinoff, who asked him how much of a down payment he could afford. Williams told Kozhinoff that he had a $10,000 credit line from HSBC Bank, earned approximately $23-26,000 per year working as a security guard, and had approximately $1500 in a bank account.

For several weeks, Kozhinoff showed Williams a number of one- and two-family homes in Jamaica, Queens, "a minority neighborhood made up of predominately West Indian, Hispanic, and Black Americans, many being immigrants." *Id.* at ¶ 31. These houses were mostly unoccupied and required "substantial renovations before become habitable." *Id.*

In December 2007, Kozhinoff showed Williams the 179th St. property. Kozhinoff stated that this property was a new construction, and Williams saw workers on-site apparently applying "finishing touches" to the property. *Id.* at ¶ 32. Kozhinoff said that the price of the property was $600,000 and that the first person to show up at his office the next day with $10,000 would get the house. Williams told Kozhinoff that "he would like to purchase the house if he could do so and it would be economically feasible with reasonable and fair terms for financing." *Id.* Kozhinoff said he would "reach out" to several banks about financing, and, after Williams told him that he had spoken to a lawyer who would represent him in the transaction for

3

$1200, told Williams that he knew an attorney who was a "family friend" and would only charge $567. *Id.* at ¶ 33.

The following day, Williams returned to the 2000 Homes office with $10,567 in cash. He met with Kozhinoff, an attorney named Joseph DeGaetano, and an unnamed man who introduced himself as a mortgage broker.[1] The mortgage broker asked Williams some questions about his finances and left the room to fill out some paperwork. DeGaetano agreed to represent Williams, and Williams paid him $567 and paid Kozhinoff $10,000. The mortgage broker returned with some forms which Williams signed. He congratulated Williams and left the room with the paperwork. Neither Williams nor DeGaetano were given copies of the forms. DeGaetano congratulated Williams on his new home and left. Kozhinoff also congratulated Williams, told him he would be in touch about the closing date, and offered him a ride to the bus stop.

It appears that the unnamed mortgage broker was defendant Mark Sanders, described elsewhere in the complaint as "an employee of Mortgage Enterprise who filled out the mortgage applications for the First Mortgage and Second Mortgage on behalf of plaintiff." *Id.* at ¶ 13. "Defendant [presumably Sanders] inserted material, misleading and fraudulent misrepresentations concerning plaintiff's income and ability to pay the mortgages into plaintiff's mortgage applications . . . without the knowledge of Mr. Williams." *Id.* at ¶ 13. The only misrepresentation apparently mentioned in the complaint was that Williams had a monthly income of $9600. Presumably, Sanders or someone else at Mortgage Enterprise then submitted these applications to GEMB, as the complaint later alleges that GEMB "extended Mr. Williams the First Mortgage and the Second Mortgage based on the application information it adopted and

---

[1] The complaint alleges that defendant Mortgage Enterprise was the mortgage broker for both mortgages of the 179th St. property. AC ¶ 45.

ratified as received from Mortgage Enterprise which was filled out by Sanders based upon an appraisal performed by John Doe." *Id.* at ¶ 18. The first mortgage was for $480,000, and had an adjustable interest rate starting at 6.75%. The second was for $120,000 and had a fixed rate of 12.125%.

The complaint does not specify when the mortgage applications were submitted or approved. However, on January 4, 2007, Kozhinoff called Williams and told him that the closing would take place the next day. The January 5, 2007 closing was attended by Williams, Kozhinoff, DeGaetano, another unnamed attorney from DeGaetano's office, and defendant Dean Mavrides, who represented the seller, defendant 2D Properties. Williams signed papers for approximately two hours. DeGaetano handed him a stack of papers and Kozhinoff handed him the keys to the property and drove him back to his bus stop.

Williams claims that Kozhinoff told him "for the first time" at the closing that he had two mortgages; *i.e.*, that he was to pay two banks $4000 per month and could refinance and lower his payments to $1500 per month if he made steady payments for six months. *Id.* at 37. The complaint states that GEMB issued the first and second mortgages; that Litton services the first mortgage and formerly serviced the second; that BOA presently holds the first mortgage; and that WMC presently holds and services the second mortgage. Williams also alleges that "[a]ccording to the First Mortgage, MERS is the nominee of GE Money Bank, its successors and assigns." *Id.* at ¶ 19.

For eight months, Williams wrote a check for approximately $2800 to Litton and one for approximately $1200 to defendant Resurgent Capital Services ("Resurgent"). During this period, Kozhinoff repeatedly called Williams offering to sell his house "if he was tired and stressed out from paying the First and Second Mortgages." *Id.* at ¶ 40. In March 2007, Williams

5

noticed leaks in his ceiling and other structural defects. He paid an unspecified sum to repair the property.

After eight months, Williams stopped making his mortgage payments. He received a letter from BOA stating that it intended to foreclose on the first mortgage. With regard to the second mortgage, he received a notice of intent to sue from a law firm on behalf of "ANSON STREET, LLC. ASSIGNEE OF WMC MORTGAGE." *Id.* at ¶ 44. He sought to sell his house "[i]n a panic." *Id.* at ¶ 43. Williams, who is now told that that his home is worth $450,000, *id.* at ¶ 48, alleges that he "was victimized by the common predatory lending scheme known as 'property flipping,'" *id.* at ¶ 1, and that he was targeted for this scheme "as a minority first home buyer." *Id.* at ¶ 3.

## DISCUSSION

A.  *The Legal Standard under Rule 12(b)(6)*

Motions to dismiss pursuant to Rule 12(b)(6) test the legal, not the factual, sufficiency of a complaint. *See, e.g.*, *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998))). Accordingly, I must accept the factual allegations in the complaint as true, *Erickson v. Pardus*, 551 U.S. 89, ---, 127 S. Ct. 2197, 2200 (2007) (*per curiam*), and draw all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal* ("*Iqbal II*"), 556 U.S. ---, 2009 WL 1361536, at *13 (May 18, 2009).

While generally "[s]pecific facts are not necessary" to state a claim so long as the statement gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests,'" *Erickson*, 127 S. Ct. at 2200 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), in at least some circumstances a plaintiff must plead specific facts in order to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. The Second Circuit has interpreted this principle as a "flexible 'plausibility standard'" under which a plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), *rev'd on other grounds*, 556 U.S. --- (2009) ("*Iqbal I*") (emphasis omitted) (interpreting *Twombly*).

When considering a motion to dismiss, a court may examine (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as exhibits or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents either in the plaintiff's possession or of which the plaintiff had knowledge and relied on in bringing suit. *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

In its recent decision in *Iqbal II*, the Supreme Court offered district courts additional guidance regarding the consideration of motions to dismiss under Rule 8. Citing its earlier decision in *Twombly*, 550 U.S. 544, the Court explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

2009 WL 1361536, at *12 (internal citations and quotation marks omitted). Thus, I must begin by "identifying pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth." *Id.* at *13. With respect to any surviving well-pleaded factual allegations, I must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

B.   *The Defendants' Motion to Dismiss*

   1.   *Williams's Fair Housing Act & Other Discrimination Claims*

> Section 3604(b) of the Fair Housing Act prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." Section 3605(a) makes it unlawful for anyone "whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."

*Barkley v. Olympia Mortg. Co.*, No. 04-CV-875, 2007 WL 2437810, at *13 (E.D.N.Y. Aug. 22, 2007).

Williams alleges that the defendants in this case violated the FHA by "targeting" him "for a predatory home sale and financing transaction" that constituted "reverse redlining." AC ¶ 76. "'Reverse redlining' is the situation in which a lender unlawfully discriminates by extending credit to a neighborhood or class of people (typically living in the same neighborhood) on terms less favorable than would have been extended to people outside the particular class at issue." *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874, 886 (S.D. Ohio 2002). Although the Second Circuit has not yet addressed whether reverse redlining violates the FHA, numerous district courts have held that this type of predatory lending connected to the purchase of a home can form the basis of a claim under either § 3604(b) or § 3605(a). *See, e.g.*, *Barkley*, 2007 WL 24537810 at *12-15.

These courts articulate the elements of a reverse redlining claim as follows: (1) plaintiff is a member of a protected class; (2) plaintiff applied for and was qualified for loans; (3)

8

the loans were made on grossly unfavorable terms; and (4) the transaction was discriminatory. *See Matthews*, 185 F. Supp. 2d at 886-87; *Barkley*, 2007 WL 24537810 at \*13; *Wiltshire v. Dhanraj*, 421 F. Supp. 2d 544, 554 (E.D.N.Y. 2005). The fourth element may be satisfied by allegations of discriminatory intent, *i.e.*, that "the lender intentionally targeted [plaintiff] for unfair loans on the basis of" protected status; of disparate treatment, *i.e.*, "that the lender continues to provide loans to other applicants with similar qualifications, but on significantly more favorable terms"; or of disparate impact on the protected class. *Matthews*, 185 F. Supp. 2d at 886-87. Because the parties do not dispute the applicability of this legal standard, I assume it provides the proper analytical framework for Williams's FHA claims.

Williams cites paragraphs 6, 48, 49, and 50-75 as alleging disparate treatment. In general, these paragraphs describe only the treatment of Williams, and do not suggest that he was treated differently than other similarly situated individuals. And paragraph 72, which states that "these unfair business practices directed at plaintiff were part of, and representative of, a pattern of misleading activities targeted at numerous other home buyers," suggests that the treatment of Williams was typical. Only paragraph 74 alleges disparate treatment, by stating that Williams "was induced to sign loan documents providing for loans that are unnecessarily expensive and which were made on less favorable terms than loans defendants brokered or made to Caucasian individuals."

This allegation, however, is merely a "formulaic recitation of the elements" of a specific claim, and is therefore "not entitled to the assumption of truth." *Iqbal II*, 2009 WL 1361536, at \*13. Furthermore, it is legally insufficient, because treating individuals of different races differently constitutes disparate treatment only if those individuals are otherwise similarly

9

situated. Accordingly, Williams has failed to make even a conclusory allegation of disparate treatment.

Williams's allegations of disparate impact and discriminatory intent are similarly conclusory. His complaint merely states, *e.g.*, that all of the defendants "target[ed] plaintiff for this scheme on the basis of his race and color," and "engaged in a pattern of practices related to housing that resulted in a disparate impact to the detriment of non-white prospective home buyers and residents and would-be residents in communities of color throughout New York City." AC ¶¶ 77-78.

I next consider whether any non-conclusory allegations suggest discriminatory intent or effect on the part of the moving defendants. Litton is only mentioned in the complaint as the "servicer" of Williams's two mortgages. AC ¶ 21. The complaint does not elaborate on what this role entails, but I cannot reasonably infer from this allegation that Litton played any role in extending credit to Williams or setting the terms by which credit would issue. Because there is no plausible allegation that Litton "made" loans, Williams cannot allege that Litton did so in a discriminatory fashion.

Similarly, MERS is described only as the "nominee" of GEMB on the first mortgage. The complaint fails to allege what MERS did in this capacity. Typically, a nominee is "[a] person designated to act in place of another, usu. *in a very limited way*," or "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others." *Black's Law Dictionary* 1149 (9th ed. 2009). Given this definition, the only reasonable inference is that MERS merely acted as a conduit, transferring the proceeds of the first mortgage from GEMB to Mortgage Enterprise, and played no role in determining whether, or on what terms, that loan would be made.

10

Finally, although the complaint satisfactorily alleges that GEMB made loans to Williams, it fails to suggest that the terms of those loans were influenced by Williams's race. Indeed, it is not clear from the complaint that GEMB was even aware of Williams's race. And because the complaint does not discuss the treatment or experience of any other borrowers in a non-conclusory fashion, it fails to suggest that any disparate treatment or impact occurred.

Williams does not directly respond to defendants' contention that many of the operative allegations in his complaint should be disregarded as conclusory under *Twombly* and *Iqbal II*. Instead, he argues that he has properly pleaded an FHA claim against defendant Mortgage Enterprise, "the mortgage originator," Pl. Mem. in Opposition to Summary Judgment 12, and that the moving defendants are liable because Mortgage Enterprise acted as their agent. Assuming for present purposes that Williams has stated an FHA claim against Mortgage Enterprise, the complaint does not establish an agency-principal relationship between that entity and any of the moving defendants. Indeed, the complaint, which states that Mortgage Enterprise "procured the First and Second Mortgages on behalf of Mr. Williams," AC ¶ 12, suggests that Mortgage Enterprise was the agent of Williams rather than the moving defendants. Accordingly, Williams has failed to plausibly allege that the moving defendants discriminated against him in ways that implicate the FHA.

The failure to properly plead the discrimination required to violate the FHA also requires dismissal of plaintiff's claims against the moving defendants under 42 U.S.C. §§ 1981, 1982 and 1985; The Equal Credit Opportunity Act; Section 296a of the New York Executive Law; and Title 8 of New York City Administrative Code.

B.  *Fraud Claims*

Williams's seventh cause of action is common-law fraud. In essence, he contends that the defendants, collectively, induced plaintiff to purchase his home and take on the mortgages by fraudulently representing that his home was valuable and the mortgages were affordable.

"In an action to recover damages for fraud, the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996). Under Fed. R. Civ. P. 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." The Second Circuit has read Rule 9(b) to require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

Williams's complaint fails to identify any statements made by the moving defendants or any of their employees. Although the complaint alleges that Mortgage Enterprise and Mark Sanders made false statements to and about Williams, it fails to demonstrate why the moving defendants are liable for those statements.

Williams also alleges a conspiracy to defraud, stating that "[d]efendants knowingly entered into an agreement to fraudulently induce plaintiff to purchase and finance the subject property at an inflated price." AC ¶ 115. With regard to the moving defendants, this claim is implausible. There is nothing to suggest that any of the moving defendants knew the property was overvalued. Indeed, the complaint elsewhere suggests that the defendants were

ignorant of inflated appraisal, alleging that "the lenders' lack of due diligent in following up on the questionable appraisals enabled the defendants to over-appraise the Premises." *Id.* at ¶ 53. Thus, the amended complaint fails to allege, at least, the moving parties' "intentional participation in the furtherance of a plan or purpose." *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986). The aiding and abetting fraud claim founders for the same reason. *See, e.g., Nat'l Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 147 (N.Y. App. Div. 1987) ("We are, however, unable to find any allegation of fact in the subject complaint permitting the inference that defendant . . . knew of or intended to aid . . . in the commission of a fraud.").

Williams's claim that the moving defendants engaged in deceptive acts or practices under N.Y. Gen. Bus. L. § 349 fares no better. Liability under this act requires a showing that, inter alia "that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). Here again, however, the misleading acts Williams alleges are those of Mortgage Enterprise and Sanders. *See* Pl. Mem. 17. As discussed above, Williams has failed to satisfactorily allege that the moving defendants are vicariously liable for the actions of these parties.

MERS also seeks dismissal of the cross-claims against it asserted in the answers of defendants 2D Properties, Mavrides, and Mortgage Enterprise. Although it does not specifically address these conclusory, one-sentence cross-claims for "contribution and/or indemnification," Answer of 2D Properties and Dean Mavrides ¶ 23; Answer of Mortgage Enterprise ¶ 19, in its memorandum, the insufficiency of these conclusory one-sentence claims is self-evident. Accordingly, its motion is granted.

CONCLUSION

For the foregoing reasons, the amended complaint is dismissed as against the moving defendants. The cross-claims of defendants 2D Properties, Dean Mavrides, and Mortgage Enterprise are dismissed against defendant MERS.[2]

So ordered.

John Gleeson, U.S.D.J.

Dated: July 29, 2009
　　　　Brooklyn, New York

---

[2] At oral argument, Williams's counsel indicated that he no longer wishes to pursue civil racketeering claims in this action. If Williams wishes to file a motion for leave to amend his complaint, he is directed to request a pre-motion conference in accordance with this Court's individual practices.